IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

COURTRINA BROOMFIELD                                    PLAINTIFF


        v.                    Civil No. 07-6029


HEALTHCARE STAFFING ASSOCIATES, INC.
d/b/a MALVERN NURSING HOME                              DEFENDANT


**ORDER**

NOW on this the 23rd day of January 2008, comes on for consideration Defendant's **Motion for Summary Judgment** (document #9) and Plaintiff's response thereto.  The Court, having reviewed the pleadings of the parties, and all other matters of relevance before it, and being well and sufficiently advised, finds and orders as follows:

1.    On May 3, 2007, Plaintiff Courtrina Broomfield (hereinafter "Plaintiff") commenced this action against Defendant Healthcare Staffing Associates, Inc., d/b/a Malvern Nursing Home (hereinafter "Defendant" or "MNH"), seeking relief for Defendant's alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 2000(e), and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1).  Specifically, from the

-1-

complaint, the following alleged instances of racial discrimination in violation of Title VII appear:

* Plaintiff, a licensed practical nurse ("LPN"), claims that she was never offered the treatment nurse position, as compared to white LPNs;

* Plaintiff claims that Defendant paid white LPNs a greater wage based on race; and

* Plaintiff claims that she was terminated on July 13, 2006 after she complained of disparate treatment due to race.[1] Additionally, Plaintiff claims that a male co-worker, Eddie Conklin, was paid more because of his gender in violation of the EPA.

Defendant now moves for summary judgment. Plaintiff has responded in opposition to this motion.

2. The standard to be applied to a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure and provides for the entry of summary judgment on a claim if:

---

[1]      Note that the complaint also alleges two additional instances of racial discrimination. However, the parties have stipulated and agreed that Plaintiff will not pursue a cause of action as to these instances. See Doc. 8. Thus, the Court will not address these allegations.

-2-

> the pleadings, depositions, answers to
> interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter
> of law.

Fed. R. Civ. P. 56(c); see also Carroll v. Pfeffer, 262 F.3d 847

(8th Cir. 2001); Barge v. Anheuser-Busch, Inc., 87 F.3d 256 (8th

Cir. 1996).   Summary judgment is to be granted only where the

evidence is such that no reasonable jury could return a verdict

for the non-moving party.   Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 250 (1986).   Accordingly, all evidence must be viewed

in the light "most favorable to the non-moving party."   F.D.I.C.

v. Bell, 106 F.3d 258, 263 (8th Cir. 1997); see also Bailey v.

United States Postal Service, 208 F.3d 652, 654 (8th Cir. 2000).

Where a movant makes and properly supports a motion for summary

judgment, the opposing party may not rest upon the allegations or

denials of its pleadings; rather, the non-movant must "set forth

specific facts showing that there is a genuine issue for trial."

Liberty Lobby, 477 U.S. at 256.   The non-moving party must "make

a sufficient showing on every essential element of its case for

which it has the burden of proof at trial."   Wilson v.

Southwestern Bell Tel. Co., 55 F.3d 399, 405 (8th Cir. 1995).

     3.   The following facts are undisputed, except where

otherwise noted:

* Plaintiff is a female African-American.  She has been a LPN since 1993.

* Defendant, MNH, is a 95 bed nursing home facility with a staff of approximately 75 individuals.  MNH routinely employs ten to twelve LPNs.

* Plaintiff was hired as an LPN by Defendant on April 25, 2004.  She was hired by MNH Administrator Jayne West ("Administrator West").

* Although MNH has employed African-American LPNs in the past, at the time Plaintiff was hired she was the only African-American LPN working at MNH.

* At the time of her hiring, Plaintiff received a copy of Defendant's Personnel Policy.

* Regarding Defendant's complaint procedure, the Personnel Policy states:

> Nursing complaints should be presented to the Charge Nurse.  If the Charge Nurse cannot work with the employee to resolve the problem, in three days the employee should present the problem in writing to the Director of Nurses.  If the problem is not resolved to the employee's satisfaction, it may be referred to the Administrator.

* Regarding termination, the Personnel Policy states:

> Failure to comply with any of the nursing home policies can result in termination.  This nursing home reserves the right to terminate any employee for unsatisfactory service, as deemed necessary by the Department Head or

Administrator.    DISMISSAL ... employees shall be discharged for cause, by the decision of their department head, in conjunction with the Administrator. In case of gross violation of the rules and regulations of the nursing home, employee will be immediately discharged.

* Defendant's "starting pay" rates apply to any LPN hired by MNH for the first time, regardless of prior nursing experience.

* Effective June 2003, the starting pay rate for LPNs was $14.00 per hour.

* Plaintiff's starting pay rate was $14.00 per hour.

* After Plaintiff started work for MNH, the home hired three additional LPNs in 2004.  Their hire dates and starting pay rates are as follows: (1) Ruby Graves - June 21, 2004/$14.00 per hour; (2) Robbin Gore – September 2, 2004/$14.00 per hour; Eddie Conklin – December 27, 2004/$14.50 per hour.

* Effective January 1, 2005, the LPN wage schedule changed and the new hire rate for LPNs was raised to $14.50 per hour.

* Eddie Conklin was hired with four days remaining in 2004 and within the first pay period of 2005.  His starting pay rate was $14.50 per hour – consistent with the new 2005 pay rate.

* During Plaintiff's employment with MNH, she received the following raises: on September 1, 2004 (after 125 days of employment) her hourly pay was raised to $14.50; on March 16, 2005 her hourly pay was raised to $14.75; on May 25, 2005 her

hourly pay was raised to $15.25; on April 26, 2006 her hourly pay was raised to $15.50.

* Defendant hired Janice Cochran, a white female LPN, on August 23, 2003. Consistent with the pay rate, her starting pay was $14.00 per hour. In November 2003, after 68 days of employment, Cochran's pay was increased to $14.50 per hour. This raise was received while Cochran was still in Defendant's 90-day probationary period.

* During her two-plus years of employment at MNH, Plaintiff received three performance evaluations.

* Plaintiff's first performance evaluation, done in July 2004, was positive – rating Plaintiff above average in 8 of 18 categories, with all the remaining categories rated as average.

* Plaintiff's next performance evaluation, done in May of 2005, rated 4 categories above average, with all others marked as average.

* Plaintiff's final performance evaluation, in April 2006, gave no above average ratings. She was rated below average on "Attendance/Punctuality." According to Defendant, during the evaluation it was noted by the evaluator that Plaintiff "tends to be late some and it's no big deal to her." According to

Plaintiff, her evaluation was changed after she reviewed and approved it to reflect below average ratings.

* A notation added to this evaluation by Administrator West states,

> Attitude has improved, tends to be negative at times and short with residents who should be her 1st priority. Receives lots of personal phone calls! Have received some family and resident complaints regarding employee attitude.

Plaintiff asserts that this notation was made after she reviewed and signed the evaluation.

* In November 2005, Defendant received a garnishment from the State of New York regarding Plaintiff's student loan debt.

* According to Administrator West, Plaintiff was very upset when this occurred and, subsequently, Plaintiff's attitude deteriorated and became increasingly negative. Plaintiff admits that she was upset by the garnishment.

* During the last few months of Plaintiff's employment, Jean Collins ("Director Collins") was the Assistant Director of the nursing home and one of Plaintiff's supervisors.

* According to Director Collins, during the last few months of Plaintiff's employment her attitude at work deteriorated. Director Collins further testified that Plaintiff made repeated

statements that she was unhappy with her work at MNH and she wanted to work somewhere else.

* On July 12, 2006, an in-service meeting (the "Medicare meeting") was held at MNH for all nurses to discuss Medicare documentation procedure.  The Medicare meeting was conducted by Rhonda Roberts, Registered Nurse ("Nurse Roberts"), and attendance was mandatory for all LPNs.  Plaintiff attended the Medicare meeting.

* According to Defendant, after the Medicare meeting, Nurse Roberts reported that Plaintiff was disruptive and made various derogatory remarks.  For example, Plaintiff complained that she had never received a pay raise during her employment with MNH.  Moreover, Nurse Roberts reported that Plaintiff fell asleep during the Medicare meeting.

* On July 13, 2006, after hearing Nurse Roberts' report concerning Plaintiff's conduct at the Medicare meeting, Administrator West called a meeting with Plaintiff and Director Collins – to discuss Plaintiff's alleged behavior at the Medicare meeting.

* During the July 13 meeting, Plaintiff admitted that at the Medicare meeting she stated that she had never received a pay

raise while employed by MNH.  Plaintiff then denied the other actions attributed to her by Nurse Roberts.

* According to Administrator West and Director Collins, upon being told that her remarks at the Medicare meeting were inappropriate, Plaintiff became belligerent – stating that the only reason she was called into Administrator West's office was because she was African-American.  According to Administrator West and Director Collins, Plaintiff began screaming and yelling, continuing to do so despite repeated requests to lower her voice.

* Plaintiff admits that she was "loud" at the July 13 meeting.  Plaintiff further admits that during the course of the meeting she was asked more than once to lower her voice.

* According to Administrator West, Plaintiff was "hateful and disrespectful" during the July 13 meeting.  Further, according to Defendant, Administrator West stated that she finally told Plaintiff that she could either improve her attitude or resign.  According to Defendant, Plaintiff responded that she would not resign and would have to be fired.

* Administrator West then informed Plaintiff that her employment with MNH was terminated.  According to Defendant, Plaintiff's termination was a result of her insubordination during the July 13 meeting.

     * Plaintiff admits that she never made any complaint about treatment based on race in any fashion, other than verbally at the July 13 meeting, despite Defendant's personnel policy requiring such complaints to be made in writing if not resolved to the employees' satisfaction at the first level.

     4.   Title VII of the Civil Rights Act of 1964 prohibits, among other things, discrimination as to the terms and conditions of employment based upon an employee's race.   There are two avenues by which a plaintiff can prove intentional employment discrimination. Cronquist v. City of Minneapolis, 237 F.3d 920 (8th Cir. 2001).   First, a plaintiff can proceed under the three-stage, burden-shifting standard set forth in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973).   Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Cronquist, 237 F.3d at 924.   Once a prima facie case is established, a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for the alleged adverse actions.   Id.   If the employer articulates such a reason, the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination.   Id.

Alternatively, a plaintiff can prove intentional employment discrimination by the standard set forth in <u>Price Waterhouse v. Hopkins</u>, 109 S. Ct. 1775 (1989).  Under the <u>Price Waterhouse</u>, "mixed-motive" standard, the plaintiff must first produce direct evidence that an illegitimate criterion, such as race, "played a motivating part in [the] employment decision." <u>Cronquist</u>, 237 F.3d at 924.  Once the plaintiff establishes such direct evidence, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have reached the same employment decision absent any discrimination. <u>Id</u>.  If the employer fails to meet this standard, the employee prevails. <u>Id</u>.

Plaintiff asserts that this case should proceed under the <u>Price Waterhouse</u> mixed-motive analysis.  As such, it is Plaintiff's initial burden to present direct evidence that an illegitimate criterion played a motivating part in Defendant's employment decisions. <u>Id</u>.  The Eight Circuit has clarified the

-11-

Price Waterhouse standard by holding that direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." Cronquist, 237 F.3d at 925 (quoting Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992)).  Viewing the evidence presented by Plaintiff in the light most favorable to her, the Court concludes that Plaintiff has failed to present *any* direct evidence of an illegitimate criterion that played a motivating role in her working conditions or termination.  Plaintiff's claims of discrimination do not "directly reflect the alleged discriminatory attitude" of the MNH decision-makers. Id.  Rather, her evidence is of the sort that "would require a series of inferences to be drawn before a discriminatory attitude could be attributed to those who made the employment decisions she

-12-

challenges." Id.; see Schleiniger v. Des Moines Water Works, 925 F.2d 1100, 1101 (8th Cir. 1991) ("Simply because a discriminatory reason might be inferred ... does not mean that a mixed motive case exists.").

Where, as is the case here, a plaintiff fails to produce direct evidence of discrimination, the three-stage McDonnell Douglas burden-shifting analysis applies. Cronquist, 237 F.3d at 926; see Euerle-Wehle v. United Parcel Serv., 181 F.3d 898, 900 (8th Cir. 1999). As Plaintiff has set forth certain facts that could arguably support a prima facie discrimination claim, the Court will assume that she has established this first element of the McDonnell Douglas analysis.

The next step in the analysis is to determine whether Defendant has offered legitimate, non-discriminatory reasons for its questioned actions. For each alleged act of discrimination, Defendant argues as follows:

-13-

* As to Plaintiff's claim that she was never offered the treatment nurse position, as compared to white LPNs, Defendant states that the "treatment nurse" job is performed by only one LPN.  According to Administrator West, this position has never been "offered" to anyone, but rather LPNs make it known that they desire the position when and if it becomes available.  Plaintiff has testified that she never applied for nor made it known that she wanted the treatment nurse position.  In fact, Plaintiff specifically testified that she did not want the position.  According to Defendant, that is why Plaintiff was never offered the treatment nurse position.

* Regarding Plaintiff's claim that Defendant paid white LPNs a greater wage based on race, Defendant asserts that all LPNs were paid consistent with its wage schedule and all raises were given consistent with MNH personnel policy.  Specifically, as to Janice Cochran, she received a raise within her first ninety days of employment – while Plaintiff received her first raise after

-14-

125 days of employment.  According to Defendant, Cochran's first raise was given relatively soon because of her exemplary job performance.  This raise was not inconsistent with Defendant's wage schedule – as the schedule does not prohibit wage increases at an accelerated rate if, in the administrator's opinion, such an increase is deserved.

Regarding Tina Webb's pay, Defendant states that she was paid more per hour than Plaintiff based on seniority, not race. Indeed, Webb began her employment as an LPN with Defendant almost ten years prior to Plaintiff.  Thus, at the time of Plaintiff's employment, Webb was being paid $16.50 per hour – consistent with the applicable LPN wage schedule.  Similarly, Defendant argues that Jackie Manning-Stone began work for Defendant in 1996 and was being paid more than Plaintiff based on seniority, not race.

* As to Plaintiff's claim that she was wrongfully terminated on July 13, 2006 after she complained of disparate treatment due to race, Defendant first argues that Plaintiff's job performance,

-15-

as evidenced by her Employee Evaluations, diminished each year. Further, Defendant argues that Plaintiff had serious attendance issues. Additionally, Defendant asserts that Plaintiff's general attitude at work had deteriorated to unacceptable levels – as demonstrated by her alleged actions at the Medicare meeting. Simply stated, Plaintiff was not meeting Defendant's expectations. As to the events of the July 13, 2006 meeting with Administrator West and Director Collins, Defendant states that the ultimate decision to terminate Plaintiff's employment was a result of her insubordination during the meeting.

The Court notes here that Plaintiff points to the fact that Eddie Conklin was not fired after violating a state regulation regarding patient care as evidence that she was subject to disparate treatment based on her race. Specifically, Plaintiff argues that she and Conklin were similarly situated, yet she was fired without having violated a specific MNH policy while Conklin was not fired after violating a state regulation. A plaintiff

-16-

may prove allegations of disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside the plaintiff's protected class. See Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259-60 (8th Cir. 1996). Employees are similarly situated when they "are involved in or accused of the same or similar conduct and are disciplined in different ways." Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994). In the instant case, Plaintiff did not violate a state regulation regarding patient care and her insubordinate actions are not comparable to the actions of Conklin. Thus, Plaintiff's disparate treatment argument fails.

Considering the foregoing, it is clear that Defendant has presented legitimate, non-discriminatory reasons for its questioned actions. Thus, the inquiry turns on whether Plaintiff has produced evidence sufficient to establish pretext – the third element of the McDonnell Douglas analysis. For a plaintiff to survive summary judgment at this stage, the rule in the Eighth

-17-

Circuit is that the evidence, considered in its entirety, must (1) create a fact issue as to whether the employer's proffered reasons are false or incorrect and (2) create a reasonable inference that a prohibited motive was a determinative factor in the adverse employment action. Cronquist, 237 F.3d at 926.

In the instant case, Plaintiff has failed to present *any* evidence that could satisfy this test. Rather than evidence, Plaintiff merely opines, in summary fashion, that the non-discriminatory reasons proffered by Defendant for its employment decisions are merely a cover-up for its real racial motivations. It is not enough, however, to merely disbelieve one's employer. See St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2750 n.4 (1993). Moreover, even if it is arguable that MNH made poor employment decisions, this is not evidence that the reasons given by Defendant for its actions are a pretext for discrimination. The employment-discrimination laws have not vested in the federal courts the authority "to sit as super-personnel departments

-18-

reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th Cir. 1995).

As Plaintiff has presented neither direct evidence of discrimination nor sufficient circumstantial evidence for a reasonable finder of fact to infer that Defendant's reasons for its treatment of Plaintiff were pretext for intentional discrimination or retaliation, Plaintiff has failed to satisfy the third element of the <u>McDonnell Douglas</u> analysis. Accordingly, the Court finds that summary judgment is proper as to Plaintiff's Title VII discrimination claims.

5. To succeed on a claim under the Equal Pay Act ("EPA"), a plaintiff must prove that the defendant discriminated on the basis of gender by paying different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

-19-

performed under similar working conditions." 29 U.S.C. § 206(d)(1); <u>Tenkku v. Normandy Bank</u>, 348 F.3d 737, 740 (8th Cir. 2003). That is, to establish a prima facie case under the EPA, a plaintiff must submit sufficient evidence that the employer paid different salaries to men and women for equal work performed under similar conditions. <u>Tenkku</u>, 348 F.3d at 741.

In the instant case, Defendant concedes that all the LPN jobs at MNH, whether performed by males or females, require equal skill, effort, and responsibility, and are performed under similar conditions. Thus, the issue of liability under the EPA turns on whether Defendant paid Plaintiff a salary different from that of her male co-workers.

At the time of Plaintiff's employment with MNH, Eddie Conklin was the sole male LPN. It is not disputed that at no time was Conklin's hourly pay rate greater than Plaintiff's. However, Plaintiff points to the fact that Conklin was hired at a higher pay rate than Plaintiff was initially hired at as evidence

of an EPA violation.  That is, when Plaintiff began work at MNH in April 2004 she was hired at an hourly rate of $14.00 per hour. Conklin was subsequently hired on December 27, 2004 at a starting pay rate of $14.50 per hour.  MNH's administrator has explained that because Conklin was hired with only four days remaining in 2004 and within the first pay period of 2005, he was started at the new 2005 LPN hire rate of $14.50 per hour.  The facts that the starting rate of pay for LPNs has increased at various times and that, due to Conklin's hire date in the last days of December, Defendant hired him at the new 2005 pay rate are not sufficient to establish a prima facie case of an EPA violation.[2]

Significantly, when Conklin was hired, Plaintiff was being paid $14.50 per hour.  Thus, Conklin was not paid more than

_____

[2]     Note that Plaintiff also uses the evidence of Conklin's starting pay rate to support her Title VII discrimination claim – stating that this is yet another example of disparate pay based on race.  The Court finds, however, that Plaintiff has failed to establish that Defendant's reasons for hiring Conklin at the new 2005 pay rate are a pretext for discrimination.

-21-

Plaintiff was currently receiving in compensation. Consequently, there was simply no disparity in pay. Because Plaintiff has offered no additional evidence to support her EPA claim, the Court finds that Defendant's Motion for Summary Judgement should be granted as to this claim.

**IT IS, THEREFORE, ORDERED** that Defendant Healthcare Staffing Associates' Motion for Summary Judgment (document #9) should be, and it hereby is, **GRANTED** and judgment in favor of Healthcare Staffing Associates will be entered by separate document filed concurrently herewith.

**IT IS SO ORDERED.**

<u>**/s/ Jimm Larry Hendren**</u>
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**

-22-